IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ANGELIKA LAMONT, Administrator
*Ad Prosequendum* of the Estate
of Eric J. Quick,

                    Plaintiff,

        v.

STATE OF NEW JERSEY,
NEW JERSEY STATE POLICE
DEPARTMENT, MARK MANZO,
CHRISTOPHER MODARELLI,
KEITH MOYER, et al.,

                    Defendants.

Civil No. 04-2476 (NLH)

**OPINION**

**APPEARANCES:**

Andrew M. Smith, Esquire
Joni Gray, Esquire
Andrew M. Smith & Associates, PC
10 North Chestnut Avenue
Maple Shade, NJ 08052
        *On behalf of plaintiff*

John C. Connell, Esquire
John P. Kahn, Esquire
Archer & Greiner P.C.
One Centennial Square
Haddonfield, NJ 08033
        *On behalf of defendants*

**HILLMAN, District Judge**

        This case involves the July 2003 police shooting death of

Eric Quick in the woods along Interstate 295 in Bellmawr, New

Jersey.  Thirty-nine bullets were fired by three state troopers,

with eighteen of the bullets striking Quick.  Presently before

the Court is defendants' motion for summary judgment.  For the reasons set forth below, the Court finds that defendants are entitled to qualified immunity on plaintiff's claim pursuant to 42 U.S.C. § 1983, that plaintiff lacks standing to assert her claims under the New Jersey Survivor's Act, and plaintiff's remaining state law claims are barred by the New Jersey Tort Claims Act.  Therefore, the defendants' motion for summary judgment is granted in its entirety.

<u>Procedural History</u>

As stated above, this lawsuit arose from the fatal police shooting of decedent Eric Quick on July 21, 2003.  Plaintiff Angelika Lamont, Administrator Ad Prosequendum of the Estate of Eric Quick, initially filed suit in the Superior Court of New Jersey, Law Division, Camden County, on April 14, 2004.  Listed as defendants were the State of New Jersey, New Jersey Division of State Police, and state troopers Mark Manzo, Christopher Modarelli, and Keith Moyer.  The complaint included claims pursuant to 42 U.S.C. § 1983; the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1 <u>et</u> <u>seq.</u>; and the New Jersey Survivors Act, N.J.S.A. 2A:15-1 <u>et</u> <u>seq.</u>  The complaint also included state law tort claims for loss of consortium.

The defendants removed the action to federal court on May 27, 2004.  The matter was initially before the Honorable Freda L.

Wolfson.  On September 3, 2004, the defendants moved to dismiss plaintiff's § 1983 claims against the State of New Jersey, the New Jersey Division of State Police, and the individual defendants in their official capacities.  The parties came to an agreement on the matter, and on October 22, 2004, Judge Wolfson entered an order dismissing with prejudice all claims brought pursuant to § 1983 against the state defendants and the individual defendants in their official capacities.

On January 20, 2005, Judge Wolfson administratively terminated the case pending the outcome of a state grand jury investigation into the troopers' conduct.  The grand jury concluded in December 2005 that the troopers should bear no criminal liability for their actions.  The Court then reopened the case on January 19, 2006.  On July 5, 2006, the matter was reassigned to this Court.

On May 22, 2008, defendants filed the instant motion for summary judgment.  In the brief accompanying their motion, defendants argue: (1) that Manzo, Modarelli, and Moyer are entitled to qualified immunity on claims brought pursuant to § 1983; (2) that the plaintiff's claims under the New Jersey Survivor's Act must be dismissed for lack of standing; and (3) that Manzo, Modarelli, and Moyer are immune from plaintiff's state law tort claims under the protections of the New Jersey

3

Tort Claims Act, N.J.S.A. 59:1-1 et seq.  Oral argument was held
on September 29, 2008.

Background[1]

On July 21, 2003, decedent Eric Quick ("Quick") was driving
in Magnolia Borough, New Jersey.  At approximately 10:00 p.m., he
stopped to ask Officer James Pratt ("Pratt") of the Magnolia
Police Department for directions.  Pratt ran the license plate of
the vehicle Quick was driving and discovered that the vehicle had
been reported stolen.  He then began to pursue Quick in his
police car.[2]  The vehicular pursuit ended when Quick abandoned
his vehicle at mile-post 27.7 of Interstate I-295.  At that
point, Quick ran into a heavily wooded area off the side of the
highway.  He was wearing a white tee shirt, sweat pants, and
socks.

Meanwhile, news of the pursuit had been sent over the police
radio.  Officer Robert Swanson ("Swanson") of the Bellmawr
Municipal Police Department arrived on the scene just as Quick
abandoned his vehicle.  Swanson decided to follow Quick into the

---

[1] The Court notes that the following facts cannot be
disputed by Quick himself.  Where certain facts are disputed by
plaintiff, the Court so indicates.  As we must on a motion for
summary judgment, we resolve all material factual disputes in
favor of the non-moving party.

[2] Plaintiff disputes whether this was a "high-speed" chase.
The Court assumes for purposes for this motion that it was not.

4

woods.  Officer John Kirkbride ("Kirkbride"), then of the Magnolia Municipal Police Department, arrived after Quick had already entered the woods.  On the ride to the scene, Kirkbride heard over the radio that Quick had fled into the woods, and he offered the suggestion of setting up a perimeter.  Kirkbride did not enter the woods himself.[3]

State Troopers Mark Manzo ("Manzo"), Christopher Modarelli ("Modarelli"), Keith Moyer ("Moyer"), Joseph Carson ("Carson"), and Thomas Hollywood ("Hollywood"), of the Division of the New Jersey State Police, also arrived after Quick had entered the woods.  Hollywood helped to establish a perimeter around the woods, while Manzo, Modarelli, Moyer, and Carson went into the woods to apprehend Quick.[4]

The woods were dark and dense.  The officers relied on their flashlights for visibility.  Soon after entering the woods,

---

[3] The parties dispute why Kirkbride did not enter the woods, which officers heard his suggestion to set up a perimeter, and whether setting up perimeter was feasible.  Plaintiff claims Kirkbride did not enter the woods because it was not a high-risk situation, and setting up a perimeter was the wiser course of action.  Kirkbride states that there was no realistic opportunity to set up a perimeter and there was no use for entering the woods with his police dog.  These issues, however, are not relevant to the excessive force analysis.

[4] The troopers testified that they also went in to back up Swanson, who was alone in the woods.  Plaintiff vigorously contests this, claiming that it was unnecessary.  The troopers' motivation for entering the woods is not material.

Modarelli encountered Quick.  In Modarelli's words, Quick was "[l]aying on the floor of the woods in like a thicket brush .... [H]e was laying in a fetal position with his back to me."  When Modarelli announced himself, Quick "got up and ran."  Moyer and Carson observed this encounter and confirmed Modarelli's account.

The officers pursued Quick as he ran.  During the chase, Quick became caught in a thicket.  Trapped, he turned towards the officers.  The officers each described Quick as assuming a "bladed position,"[5] with his left foot back and right shoulder forward.  Quick's left hand was at his forehead, and his right hand was tucked into his left waistband.

The five officers had Quick surrounded in a semi-circle. From Quick's point of view, Moyer was furthest to the left, followed by Modarelli, Carson, and Manzo.  Swanson was behind Manzo.  Quick's right shoulder was pointed towards Manzo, the officer furthest to the right.  Each of the officers testified that he was able to see Quick's right hand tucked into his left waistband.  Each of the officers testified that he believed Quick was holding a weapon.

_____

[5] In Modarelli's words, a bladed position is "a defensive position where one foot is dropped back and ... your shoulder's pointed.  You're not standing squared.  You're bladed.  Your one shoulder is forward and one foot is back."

All of the officers except Swanson, who was directly behind Manzo, pointed their guns at Quick.  Various officers shouted contradictory commands at Quick, including "Don't move!" and "Show me your hands!"  Quick then made a sudden movement, rapidly removing his right hand from the left side of his waistband.

In response to Quick's movement, Moyer, Modarelli, and Manzo opened fire.  Carson's flashlight was hit at the beginning of the shooting and he fell to the ground.[6]  Swanson, positioned directly behind another officer, did not fire.  The shooting lasted somewhere between 2 and 10 seconds.[7]  The officers did not reload their weapons during the shooting.

After the shooting, the troopers were transported back to the barracks by Hollywood.  Hollywood testified that during the ride, "one of the troopers had asked me, because I guess he had seen me go near the body, asked me if I had seen the gun and at which time, I told him no, I didn't see it."  The troopers were first questioned about the incident two days later.

It was later determined that Quick had, indeed, been clutching an object in his right hand.  The object was not a gun,

---

[6]Plaintiff has not raised a material issue regarding the defendant officers' observation that Carson had fallen backwards indicating in their view that Quick might have returned their fire.

[7]Defendants have provided evidence that the shooting occurred in less than four seconds.

but rather a two-inch long glass crack pipe.  Modarelli, Moyer,
and Manzo had collectively fired thirty-nine shots.  Eighteen
bullets struck Quick, approximately half entering through the
back of Quick's body.  Those bullets that entered through the
back of Quick's body entered primarily through the buttocks and
thighs.

<u>DISCUSSION</u>

Plaintiff argues that summary judgment is inappropriate for
several reasons.  First, plaintiff argues that the reasonableness
of the defendants' decision to enter the woods is a question for
the jury.  Second, plaintiff argues that there are genuine issues
of material fact regarding the reasonableness of the use of
deadly force.  Third, plaintiff argues that the credibility of
the officers is at issue, and that summary judgment should
therefore be denied.

I.  <u>Standard for Summary Judgment</u>

Summary judgment is appropriate where the Court is satisfied
that "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56(c).

8

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon

mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

II.   Claim pursuant to 42 U.S.C. § 1983

It is well known that 42 U.S.C. § 1983 creates a cause of action against those who, acting under color of law, violate an individual's constitutional rights.  Plaintiff's § 1983 claim alleges that Moyer, Modarelli, and Manzo violated Quick's Fourth Amendment rights by using excessive force against him. Defendants move for summary judgment, asserting that they are entitled to qualified immunity.

The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan , 129 S. Ct. 808, 815 (2009).  The doctrine provides a government official

10

immunity from suit rather than a mere defense from liability, and, thus, the issue of whether qualified immunity applies should be decided at the earliest possible stage in litigation.  Id.

In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Id. at 816.  These questions may be answered in order, but courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id. at 818 (receding from Saucier v. Katz , 533 U.S. 194 (1998), which required the two questions to be answered sequentially).  If the answer to either question is "no," the analysis may end there.  See id. at 823 (finding that because the unlawfulness of the officers' conduct was not clearly established, the officers were entitled to qualified immunity, without having to answer the question of whether the officers violated the plaintiff's constitutional rights).

Plaintiff's argument that the officers used excessive force comprises three separate parts.  First, plaintiff argues that the use of deadly force was unreasonable because the officers should

have established a perimeter instead of pursuing Quick into the woods.  Second, plaintiff argues that the officers did not reasonably believe that Quick posed a deadly threat to them at the time of the shooting.  Third, plaintiff argues that the number of bullets that entered Quick from the back indicates that the officers continued to shoot after Quick could no longer pose a threat to them.

A.   Unreasonableness prior to the deadly encounter

      Plaintiff argues that the defendants' actions prior to the shooting should strip them of qualified immunity.  Plaintiff claims that the troopers violated protocol in pursuing Quick rather than establishing a perimeter, and that the troopers should have apprehended Quick non-violently during the first encounter in the woods.  But for these unreasonable actions, plaintiff argues, Quick would still be alive today.  These alleged errors, however, do not deprive the defendants of qualified immunity.

      In Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999) the Third Circuit was presented with a similar argument.  Having reversed on other grounds, the court declined to decide whether an officer should be denied qualified immunity if her violation of police protocol "unreasonably created the need for deadly force."  Id.

at 295.  However, the <u>Abraham</u> Court pointed to a body of case law
from other circuits that is instructive in this case.
Where an officer's intentional misconduct was the sole cause of
the need to use deadly force, some courts have denied qualified
immunity.  For example, in <u>Estate of Starks v. Enyart</u>, 5 F.3d 230
(7th Cir. 1993), an officer jumped in front of the decedent's
vehicle in an attempt to apprehend him.  Prior to that moment,
the decedent had not posed a danger warranting the use of deadly
force.  Once in front of the vehicle, however, the officer shot
the decedent.  The officer argued that he was entitled to
qualified immunity because the decedent posed a threat to him at
the instant the shooting occurred.

     The Seventh Circuit denied the officer qualified immunity.
The Court reasoned that by jumping in front of the vehicle, the
officer "would have unreasonably created the encounter that
ostensibly permitted the use of deadly force to protect him,
because the decedent would have been unable to react in order to
avoid posing a deadly threat" to the officer.  <u>Id.</u> at 234.
Furthermore, the Court held, "[i]f a fleeing felon is converted
to a 'threatening' fleeing felon <u>solely</u> based on the actions of a
police officer, the police should not increase the degree of
intrusiveness."  <u>Id.</u>

Starks is distinguishable from the case at hand.  Here, the act that presumably justified the use of deadly force was not the officers', but rather Quick's.  The troopers did not resort to deadly force until Quick suddenly ripped his right hand from his waistband.  This precipitating event was a voluntary act by Quick.  Quick could have elected to leave his hand in his waistband, or to slowly withdraw it in a non-threatening manner. He was not forced by the officers to make such a threatening movement.[8]  Therefore, the rule of Starks is inapplicable.

This case is more similar to cases in which qualified immunity has been granted, despite the possible contributory role of an officer's actions in creating the need for deadly force. For example, in Young v. City of Killeen, Tex., 775 F.2d 1349 (5th Cir. 1985), the Fifth Circuit held that an officer was entitled to qualified immunity despite the fact that his failure to follow proper police procedures may have been a cause-in-fact of the need to use deadly force.  In that case, the district court found that the officer had committed six separate errors in

---

[8] The Court notes the possibility that Quick's action may have been an attempt to comply with the officers' command, "Show me your hands!"  Perhaps the officers should have instructed Quick to show his hands slowly.  However, the Court cannot justify denying qualified immunity on the basis of an imperfect command.  Indeed, Quick's action was not even a foreseeable response to the command, as a reasonable person given the same command under the same circumstances would not make a sudden movement.

his apprehension of the decedent, who was driving a car.  When the decedent reached under his seat, the officer believed that he was reaching for a weapon and shot him.  The district court denied the officer qualified immunity, reasoning that the officer had "creat[ed] a situation where a fatal error was likely."  Id. at 1351.

The Fifth Circuit reversed, holding that the officer was entitled to qualified immunity despite his errors.  The Court reasoned, "If [the decedent]'s movements gave [the officer] cause to believe that there was a threat of serious physical harm, [the officer]'s use of deadly physical force was not a constitutional violation.  The only fault found against [the officer] was his negligence in creating a situation in where the danger of such a mistake would exist.  We hold that no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts."  Id. at 1353 (internal citations omitted).

The facts of Young are analogous to this case.  Even if the Court assumes that the officers violated proper procedures by entering the woods and by failing to apprehend Quick upon their first encounter, these alleged breaches do not suffice to strip the troopers of qualified immunity.  Quick created the situation, and even if his actions might have been misinterpreted to require

15

the use of deadly force, that misinterpretation does not create a constitutional violation.  Thus, the Court cannot find that the officers' should be stripped of qualified immunity based on their actions prior to the deadly encounter.

B.  <u>Decision to Use Deadly Force</u>

Plaintiff next argues that the officers should be denied qualified immunity because at the time of the shooting, they did not reasonably believe that Quick posed a threat.  Plaintiff argues that the officers should not have thought that Quick posed a threat, as he had been running away from the police, was wearing sweat pants and was shoeless, and was known only to have been driving a stolen car; that there is an issue of material fact as to what the defendants actually saw during their final encounter with Quick; and that the fact that Carson and Swanson did not fire belies defendants' assertions that deadly force was warranted.

Plaintiff's first argument is without merit.  The Court assumes for the sake of analysis here that the officers had no reason to believe that Quick posed a threat before the final encounter.  However, once Quick faced off with the officers with his right hand in his left waistband clutching an object, the

officers reasonably believed that Quick was armed.[9]  It is of no
import that the object Quick was later found to have been
clutching was a small crack pipe and not a gun.  Given Quick's
stance, it was reasonable for the officers to conclude that the
object Quick was clutching was a weapon.

Plaintiff's second argument, namely that there is an issue
of material fact as to what the officers saw, also fails.  It is
unfortunate, but true, that in situations where deadly force is
used, the decedent is not alive to contest the factual accounts
given by police officers.  This in itself is not enough to give
rise to a genuine issue of material fact.  In this case, all of
the officers on the scene testified as to Quick's bladed
position.  Plaintiff argues that based on the officers'
descriptions of where they were standing, they could not have
seen Quick's position, but the Court does not see any conflict
between the officers' positions and their accounts of what they
saw.[10]  Therefore, there is no genuine issue of material fact as

---

[9]The troopers and officers testified that they believed that
Quick was concealing a weapon.  Moyer specifically testified that
he saw the "muzzle of the weapon sticking out of his pants," and
that the weapon "looked like the snub nose of a revolver . . . it
could have been any of those weapons, very small, small enough to
fit in the palm of your hand."

[10] From left to right (from the viewpoint of Quick), the
officers' testimony places them in the following order: Moyer,
Modarelli, Carson (slightly behind), then Manzo.  Swanson was
behind Manzo.  Quick's right shoulder was pointed directly
towards Manzo, the officer furthest to Quick's right.  Therefore,

to whether the troopers saw Quick in a bladed position with his right hand in his left waistband.

Plaintiff finally argues that the trooper's decision to fire was not objectively reasonable because the two most experienced officers on the scene, Carson and Swanson, did not shoot. Swanson testified that he did not shoot only because he would have risked shooting Manzo, who was in front of him.  Carson testified that he did not shoot because as soon as the shooting began, his flashlight was hit, and he fell down.[11]  Neither officer testified that he felt the use of deadly force was unjustified.  Even drawing all inferences in favor of the plaintiff, the Court cannot find that Carson and Swanson failed to shoot because they did not feel that deadly force was necessary.  Therefore, plaintiff's argument must fail.

The Court concludes that there is no genuine issue of material fact regarding the reasonableness of the troopers' initial decision to use deadly force.  It is undisputed that Quick actually assumed a bladed position.  It is undisputed that

---

it appears that all of the officers would have been able to see Quick's front and the fact that he had his right hand in his left waistband.

[11]The fact that Carson's flashlight was hit by "something" and he fell to the ground as the shooting began makes the troopers' actions objectively reasonable in that it would have been reasonable to believe that Carson had been hit by fire from Quick's perceived gun.

18

Quick had his right hand in his left waistband and was clutching

an object held there.  It is undisputed that Quick, in a sudden

movement, extracted his right hand from his waistband.[12]

Although plaintiff argues that the troopers could not have seen

what undisputedly occurred, she has failed to raise a genuine

issue of material fact as to what the troopers saw.[13]

Given Quick's posture, it was objectively reasonable for the

troopers to believe that he was clutching a weapon in his right

hand.  It was also objectively reasonable to assume that when

Quick ripped his hand from his waistband, he was drawing a

weapon.  The officers were thus objectively reasonable in

believing that Quick posed a lethal threat to them.  Under these

circumstances, they were justified in responding with deadly

---

[12] As we noted above, it is also undisputed that at least
one officer saw Carson fall backward suggesting the possibility
of return fire.

[13] Plaintiff emphasizes that the defendants' account of what
occurred is inherently suspect because Quick is not alive to tell
his version of events.  This self-serving testimony, plaintiff
argues, mandates the denial of summary judgment.  The Court
recognizes that the inability of the victim to share his side of
the story is another unfortunate consequence of a fatal police
shooting.  Even in those circumstances, however, the Court is
constrained to consider the evidence on the record, and cannot
categorically discount defendants' proof simply because the
victim is unable to contradict--or even corroborate--that proof.
Here, plaintiff has not provided sufficient evidence to
demonstrate an issue of material fact with regard to the
reasonableness of the defendants' actions.

force.  The officers thus did not violate Quick's Fourth
Amendment rights by initiating the use of deadly force.

C.  Continuation of the Shooting

      Courts have recognized that an officer's use of deadly
force, which may initially be reasonable, may become unreasonable
as the course of events unfolds.  In this case, the Court has
already determined that the troopers were justified in their
initial decision to use deadly force.  However, because the
troopers fired thirty-nine shots over the course of two to ten
seconds, and of the eighteen shots that hit Quick, approximately
half entered through the back of his body, it must be determined
whether the manner in which deadly force was used violates the
constitution.

      There is a body of caselaw which addresses the situation
where force justified at the beginning of an encounter is not
constitutional even seconds later.  The basis for that reasoning
is that the justification for the initial force had been
eliminated, yet the use of force continued.  For example, in
Waterman v. Batton, 393 F.3d 471, 474-75 (4th Cir. 2004),
officers fired at a suspect as he accelerated his vehicle toward
them at a toll plaza.  Officers continued to fire at the suspect
after the vehicle passed them and it was no longer a threat.
Waterman, 393 F.3d at 475.  Ten bullets were fired in total

during the six-second incident.  Id.  The Fourth Circuit held

that the officers were not entitled to qualified immunity because

the officers knew or should have known that the immediate threat

of harm had passed.  Id. at 482; see also Hopkins v. Andaya, 958

F.2d 881, 887 (9th Cir. 1992) (per curiam) (cited in Abraham v.

Raso, 183 F.3d 279 (3d Cir. 1999)) (holding that second use of

deadly force was unreasonable when "the exigency of the situation

lessened dramatically" after the first use of deadly force).

     The situation here, however, is different from Waterman and

similar cases.  When Quick made a sudden movement and ripped his

right hand from his left waistband, the troopers, believing Quick

had a gun, all fired at the same time and stopped once Quick was

no longer a threat.  There is no evidence that any of the

troopers fired mindlessly or paused and then resumed firing after

Quick was on the ground face-down.[14]  Instead, the evidence

demonstrates a rapid, continuous sequence of bullets from three

_____

     [14]Plaintiff submitted an expert report by James A. Williams,
a law enforcement expert with 30 years' experience.  In his
opinion, "based on the description of bullet travel (trajectory)
as certified by the Medical Examiner, Dr. Junaid Shaikh,
approximately, eleven (11) shots were fired into the body while
Mr. Quick was fallen on the ground offering no danger or
resistance."  (Document 117, p. 12.)  The fact that eleven
bullets struck Quick in the posterior of his body does not,
standing alone, show that Quick was no longer a threat.
Moreover, the bullets that struck Quick posteriorly were to his
buttocks and legs, which is consistent with defendants' account
that Quick spun while being shot.

semi-automatic weapons with thirteen bullets each within a two to ten second window that ceased once Quick fell to the ground. Even though the number of bullets fired appears "excessive" in layman's terms, the firing of those bullets can be considered a single use of deadly force reasonably employed by the troopers. To hold otherwise would require the Court to parse out when the conduct became unreasonable based on the number of bullets fired. Compare Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996) (where a suspect who had his hands cuffed behind his back in a police cruiser, but moments later officers observed him pointing a firearm, the court held that the number of bullets--twenty-two--shot in a manner of seconds did not render the shooting excessive, and commented, "That multiple shots were fired does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat.").

The police are able to use the instruments available to them in order to negate a threat. In a situation such as this one, the law does not require an officer to "wait and see" – that is, where Quick had taken off in a stolen car, abandoned the vehicle on an interstate, ran into the dark woods, and, when trapped by law enforcement, stood in a menacing, offensive posture with his hand in his pants gripping what could have been a gun, the troopers were not required to wait and see what was actually in

22

Quick's hand when he rapidly removed it from his waistband in a threatening manner.  The only objectively reasonable response in this situation was to use deadly force.

Consequently, because the Court finds that deadly force - in the determination to use it and how it was carried out - was objectively reasonable in this case, defendants are entitled to qualified immunity and to summary judgment on plaintiff's excessive force claim.[15]

## II.  State law claims

Plaintiff's complaint also includes state law claims brought under the New Jersey Survivor's Act, N.J.S.A. 2A:15-1 et seq., the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1 et seq., and the common law tort of loss of consortium.  Defendants argue that plaintiff lacks standing to assert a claim under the New Jersey Survivor's Act and that they are immune from tort law claims under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. Plaintiff has not opposed defendants' arguments on these points.

---

[15]As stated above, because the Court has found that defendants did not violate Quick's Fourth Amendment constitutional right to be free from the use of excessive force, the second question of whether that constitutional right was clearly established does not need to be answered as part of the qualified immunity analysis.  See Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).

The Court agrees with defendants.  First, with regard to plaintiff's Survivor's Act claim, only a general administrator or executor has a cause of action under the Survivor's Act.  Section 2A:15-3 of the Act states that "[e]xecutors and administrators" may sue for torts committed against a decedent as if the decedent were still alive.  The courts have interpreted this section to exclude actions by administrators ad prosequendum.  See, e.g., Kern v. Kogan, 226 A.2d 186, 193 (N.J. Super. Law Div. 1967) ("[T]he administrator Ad prosequendum is the proper party to bring a wrongful death action and the general administrator is the proper party to institute a survival action.").  Plaintiff has not alleged that she is the general administrator or executor of Quick's estate, and defendants have provided documentation that as of July 19, 2007, no general administrator had been appointed to the estate of Eric Quick.  Therefore, plaintiff does not have standing to bring survivor claims.  These claims must be dismissed for lack of subject matter jurisdiction.

Second, with regard to defendants' argument that they are entitled to summary judgment on the remaining state law claims, defendants argue that they are immune from suit pursuant to the New Jersey Tort Claims Act (NJTCA), N.J.S.A. 59:1-1 et seq.  The NJTCA provides absolute immunity to a public employee for "any injury caused by . . . a person resisting arrest or evading

24

arrest" or "any injury resulting from or caused by a law enforcement officer's pursuit of a person."  N.J. Stat. Ann. 59:5-2(b),(c).  Only a finding that the officer engaged in "willful misconduct" abrogates that immunity.  See Tice v. Cramer, 627 A.2d 1090, 1105 (N.J. 1993) (citing N.J. Stat. Ann. 59:3-14a ("Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.")).

What constitutes "willful misconduct" is not expressly defined in the statute.  The New Jersey Supreme Court has interpreted "willful misconduct" to require "'much more' than mere negligence," and it "will fall somewhere on the continuum between simple negligence and the intentional infliction of harm."  Alston v. City of Camden, 773 A.2d 693, 702 (N.J. 2001). In the context of police vehicular pursuits, the New Jersey Supreme Court has instructed that willful misconduct has two elements: "1) disobeying either a specific lawful command of a superior or a specific lawful standing order and 2) knowing of the command or standing order, knowing that it is being violated and, intending to violate it."  Fielder v. Stonack, 661 A.2d 231, 243 (N.J. 1995).

With regard to the police vehicle pursuit of Quick, there is no evidence in the record that defendants disobeyed a command or order.  With regard to the foot chase, to the extent that the requirement that the knowing and intentional violation of a direct order applies to a police officer dealing with a person who is resisting arrest, there is nothing in the record to show that defendants knowingly and intentionally disobeyed a superior officer's command during their interaction with Quick.  Thus, because plaintiff has not demonstrated that defendants should be stripped of their NJTCA immunity, plaintiff's state law claims are barred.


                              CONCLUSION

As a news headline, the fatal, thirty-nine bullet shooting of an unarmed, shoeless suspect in the woods reads as a tragic misuse of police force.  While the loss of any life is regrettable and even heartbreaking, the core uncontested details of this case reveal an encounter where the use of deadly force was - as sad as the outcome might be - objectively reasonable. As a result, defendants are entitled to qualified immunity, and summary judgment must be granted in their favor on plaintiff's claim of excessive force.  Additionally, for the reasons stated

above, defendants are entitled to summary judgment on plaintiff's
state law claims.  An appropriate order will be entered.


Date: February 25, 2009          s/Noel L. Hillman

At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.